STATE, Plaintiff, vs. FARMER, Defendant.

*June 9—July 1, 1948.*

*Harlan B. Rogers* of Portage, special counsel for the Board of State Bar Commissioners, for the plaintiff.

For the defendant there was a brief by *Ela, Christianson & Ela* of Madison, and oral argument by *Emerson Ela.*

Per Curiam.    The matter was presented in this court upon two counts.    We shall treat each count separately.

Count 1 charged that the defendant did attempt to mislead, trap, overreach, and perpetrate a fraud upon adverse parties

not represented by counsel in violation of the canons of ethics of the American Bar Association and his duty and obligations as an attorney at law.

The facts in relation to count 1, briefly stated, are as follows : Alois Dorshorst, a twenty-three-year-old ex-service man, was living with his wife and children on a farm near North Bristol. On the morning of June 29, 1946, while Dorshorst was working on a farm some distance from home, one Ed Scheuerell came to the Dorshorst farm and, according to the story of Mrs. Dorshorst, made an assault upon her and attempted to rape her. She went immediately and notified her husband. Dorshorst took his wife and children to her grandparents' home. He went at once to the Scheuerell farm where he met Scheuerell, charged him with having made an assault upon his wife, and then assaulted Scheuerell. . On Thursday, July 11, 1946, Dorshorst went to the Scheuerell farm, told Scheuerell that his wife had been seriously injured, and demanded payment of $2,500 by Scheuerell as damages. He also informed Scheuerell that unless payment of that amount was made by the following Tuesday, July 16, 1946, he would consult an attorney and take Scheuerell into court.

The next day Scheuerell retained the defendant as his attorney in reference to the Dorshorst matter. Scheuerell told the defendant that the charge made by Mrs. Dorshorst was false and that Dorshorst had threatened to have him arrested unless he paid $2,500 by July 16th. Defendant believed his client's statement and thought that his client was being blackmailed and "shaken down" by the Dorshorsts. The same evening the defendant, with his partner, Mr. Ricks, drove to the Dorshorst farm to interview Dorshorst for the purpose of obtaining adverse admissions from Dorshorst and postponing the commencement of any action against Scheuerell. The defendant inquired of Dorshorst in regard to his claim and was informed that it was $2,500, and informed the defendant that he would take $2,000 or take Scheuerell into court. The de-

fendant then asked Dorshorst to come to his office on Wednesday, July 17th, and told him they could make a settlement.

The defendant then employed a detective to investigate the claim of Dorshorst. From the report of the detective the defendant came to the conclusion he did not have sufficient admissions from Dorshorst, so he decided to plant a reporter in order to make a record of his conference with Dorshorst the following day at his office. While Dorshorst was in his office a stenographer took down the conversation. The defendant told Dorshorst that he advised Scheuerell there was nothing he could do but settle, but that Scheuerell did not have the money to pay the $2,000, but that it would be paid; that Scheuerell had delivered government bonds to Farmer to raise the money, and that he, Farmer, had sent them to Chicago to be cashed, and that the money would not be back before the end of the month. These statements were false.

Dorshorst then informed him that he would not extend the time of payment unless he had something in writing, signed by Scheuerell, that the money would be paid by August 7, 1946. The defendant then prepared an instrument containing the admissions he desired, but which he had no intention of submitting to Scheuerell, and permitted Dorshorst and his wife to sign under the belief that they were signing a contract of settlement by Scheuerell. The defendant informed Dorshorst that he would have Scheuerell sign the contract.

On August 7th Dorshorst and his wife's uncle went to Farmer's office to complete the settlement. Farmer informed them that the money had not come. After they left the office Farmer recalled the uncle and told him to keep out of it because the Dorshorsts were guilty of blackmail. The uncle advised Dorshorst to secure an attorney, and he retained R. B. Hovel, an attorney at Sun Prairie.

The matter was laid before the district attorney and on the advice of his attorney Dorshorst commenced an action against Scheuerell for damages. Farmer appeared in this action as

attorney for Scheuerell. The matter was compromised by the payment of $1,350 to Mrs. Dorshorst by Scheuerell.

After reviewing the facts and commenting at some length upon the evidence the referee stated his conclusion in the following language:

"The obtaining of such a signed admission for such purpose, by the use of fictitious circumstances or elements is of such common and accepted practice that one who in good faith follows it for the protection of his client and the exposure either of falsehood or crime should not be held to have been guilty of reprehensible conduct requiring disbarment. . . .
"If this is to be considered unethical conduct and such long established practices changed, a disbarment judgment should not be predicated upon such practice, until the defendant has at least had notice of the new code;" and held that disbarment of the defendant was not warranted.

We cannot concur in this conclusion of the referee. Dorshorst was a young man at the time, twenty-three years of age, just out of the service, and without experience in legal matters. He believed that he had sustained a most grievous injury at the hands of Scheuerell and was seeking redress. In order to procure the statement signed by Dorshorst and his wife the defendant wholly misrepresented the circumstances with which Dorshorst was surrounded. Dorshorst had no knowledge that what he said was being taken down at the time of the interview. He was led to believe that when he signed the admissions he was signing a contract of settlement, was told that bonds had been placed with the defendant and that the money would be paid when they were cashed, and that the instrument was to be presented to Scheuerell, all of which was untrue.

Canons 9 and 15 of the canons of ethics of the American Bar Association provide:

". . . It is incumbent upon the lawyer most particularly to avoid everything that may tend to mislead a party not represented by counsel, and he should not undertake to advise him

as to the law. . . . The office of attorney does not permit, much less does it demand of him for any client, violation of law or any manner of fraud or chicane. He must obey his own conscience and not that of his client."

The conduct of the defendant in this matter was a clear violation of these canons. He did not have even the excuse of a request from his client; the whole scheme was of his own invention.

For the findings of the referee we are asked to substitute the findings proposed by the plaintiff, and to impose discipline upon the defendant. While the conduct of the defendant is subject to censure and strong disapproval, the question of discipline presents another matter. In this case no use was made of the admissions wrongfully procured from Dorshorst. The defendant says they were not used by him in any way. This would seem to indicate that the defendant realized that he had overstepped the bounds of proper professional conduct and for that reason made no use of them. In view of the fact that the defendant has been subjected to a protracted trial and his misconduct given wide publicity we have concluded that he has been subjected to enough punishment to deter him from further activities of this kind.

In count 2 the defendant was charged with negligence, carelessness, and incompetency in the discharge of his duties as attorney for the executrix in the probate of the will of Edward Krebs before the county court of Dane county, Wisconsin; that to conceal such negligence and incompetence the defendant misrepresented the facts to his client and demanded payment in advance of his fees and disbursements before he would complete the administration of such estate.

Edward Krebs died March 14, 1944, leaving a will which was duly probated. After some bequests he left to his wife Emma Krebs all the rest and residue of his estate. In the fifth paragraph of the will he stated in substance as follows: In the early part of 1930 my wife turned over to me for investment $20,000 which she had inherited from her brother

George Sprengel. Of such amount I have returned to her $5,500. "The remaining $14,500 belonging to my said wife, is, at the date of this will, commingled with my own property. These facts are set forth in this will, so that my executor will make certain to see that the principal amount of my said wife's interest in my estate is properly segregated and turned over to her. Because of my support of our home, I feel that I have paid, and will continue to pay, the equivalent of interest during my lifetime."

On October 14, 1943, the testator executed an instrument called "Acknowledgment of Indebtedness." It is addressed to his wife, relates to the $14;500 which is commingled with his estate, and the last paragraph is as follows:

"This acknowledgment of indebtedness is made in writing, so that in the event of my death, there may be no question of your rightful claim against my estate, arising from the money which you gave me to invest, as recited above. The principal amount of such money should be returned to you, but through my support of our home, you have received the equivalent of interest, so no interest should be added for any period prior to my death."

The defendant was attorney for the executrix and acted as her attorney. No claim was filed in behalf of Emma Krebs against the estate of her husband. As a result what remained after the payment of the other legacies and expenses of administration, including the moneys belonging to Emma Krebs, was assigned to her as a part of her husband's estate and so subject to an inheritance tax. Apparently the acknowledgment of indebtedness was in the same envelope with the will but whether it was or not, the will itself would clearly indicate to a careful lawyer that a claim should be filed in behalf of Emma Krebs against the estate of her husband. No such claim was filed. . As result of the failure of the defendant to prepare and file a claim a tax was levied against the $14,500 amounting to $705.58 which was finally adjusted at $352.79.

In the account of the executrix prepared by the defendant there are numerous errors and inaccuracies. However, the document was corrected, so far as we are able to discover, without any loss to the estate, although it was corrected in thirty separate and distinct particulars. In connection with the final account the defendant sent Mrs. Krebs a statement which included $147.83 disbursements, professional service $1,200, total, $1,347.83; courtesy credit $600; leading her to believe that his charges had been voluntarily reduced by that sum. In the final account prepared by the defendant appears the following: "Professional services, $1,165.07." County Judge EVANS testified that he made the notation therein which reduced the fees from $1,200 to $600. He testified:

"I called Mr. Farmer into my chambers, and I told him that in view of the difficulties I had had with the estate that I was going to cut his fees. And he replied that if—that is, to the effect, that if I felt they should be, why, it was entirely up to me. I might add that it was a very brief conference."

If one were very technical he might consider that when the defendant did not object to the cut he consented. It was certainly, however, very far from a "courtesy" reduction.

There was a controversy as to the payment of $49.65 on account of federal taxes. It appears that the estate was not subject to federal taxation. The referee found that that amount had not been paid to the defendant and that finding cannot be disturbed.

While the conduct of the defendant as attorney for the executrix discloses so many errors and irregularities as to suggest the question of his competency, it is considered that in view of all the circumstances of the case and of the fact that the county court disallowed $600 of his charge for services on that account, that further discipline should not be imposed.

It was a fortunate circumstance that the widow was the residuary legatee under her husband's will, because she sus-

tained no financial loss except the amount paid for inheritance taxes. Had he made a different disposition of the remainder she might have lost the entire amount.

While we cannot concur in the conclusions reached by the referee as to the moral and ethical character of defendant's professional conduct, we do concur in his recommendation that the defendant should not be disbarred, for the reason already indicated. Except as indicated the plaintiff's motion is denied, and the suggestion of the referee that the proceeding be dismissed is not concurred in.

HUGHES, J., took no part.